MANKATO MILLS COMPANY v. M. G. WILLARD.[1]

January 27, 1905.

Nos. 14,174—(103).

**Contract of Indemnity.**

The contract which is the subject-matter of this action construed. The findings of fact and decision of the trial court are sustained by the evidence.

**Incompetent Evidence—Harmless Error.**

Where issues of fact are tried by the court without a jury, and incompetent evidence is received, but the competent evidence is sufficient to support the findings of fact, and there is no reasonable ground for inferring from the character of the incompetent evidence that it was or might have been a material factor in the court's determination of the facts, the admission of such evidence is not reversible error.

[1] Reported in 102 N. W. 202.

Appeal by defendant from an order of the district court for Blue Earth county, Lorin Cray, J., denying a motion for a new trial. Affirmed.

*Thomas Hughes* and *Pfau & Pfau*, for appellant.

*A. E. Clark,* for respondent.


START, C. J.

This is an action to recover damages from the defendant upon a written contract to indemnify the plaintiff, as it claims, against any loss it might sustain from the manufacture of certain hosiery covered by letters patent owned by the defendant, for which he was to be paid a royalty. The case was tried by the court without a jury, and as a conclusion of law from the facts found by the court judgment was ordered for the plaintiff and against the defendant in the sum of $2,316.34, with interest. The defendant appealed from the order denying his motion for a new trial.

The assignments of error are to the effect that the findings of fact and conclusions of law are not sustained by the evidence, and that the court erred in its rulings as to the admission of evidence.

A decision of the question whether the findings and decision of the trial court are sustained by the evidence depends largely upon the construction to be given to the contract. The contract recites that the defendant is the owner of a certain patent covering a device for the manufacture of a certain style of hosiery for the better protection of ankles from cold, known as "Warm Ankles." It then in express terms grants to the plaintiff the exclusive right to manufacture and sell this style of hosiery under the patent. This is followed by these provisions:

> And in consideration of such grant said company shall pay to said Willard a royalty of ten per cent. of the selling price of the various styles of "Warm Ankles" manufactured and sold on regular orders within two and one-half years from January 1st 1901, and a royalty of five per cent. thereof within the next two and one-half years thereafter. Such percentage is to be based on margins between cost and selling price as affected by fluctuations in cost of labor and raw materials, so that it shall

94 M.—11

not be materially above or below 50 per cent. of the net profit during said first two and one-half years. "Regular Orders" are understood to be such as are received from salesmen and by mail from territory that has been canvassed by salesmen. Any bad accounts, countermands, and returned goods on which royalties have been so allowed are to be charged back in proportion to the loss. All profits resulting otherwise than above are to belong to said company and it can use such letters patent and "Warm Ankles" in any business way it chooses.

It is understood that if the manufacture of said "Warm Ankles" shall become unprofitable said company may discontinue its manufacture but that all rights under this agreement shall cease at the same time. It is further agreed and understood that if there is any loss in disposing of any of the so-called "Warm Ankles" hosiery manufactured prior to January 1st 1901, or if it is necessary to sell any of said goods manufactured since that date and during the term of this contract at a loss in order to dispose of them said M. G. Willard shall assume same and that unsalable stock shall be charged to his account at cost of manufacture and material, but he is to have the option to take all such stock at such cost or let them be sold at a loss.

The provisions of the contract relating to the losses to be assumed by the defendant are somewhat obscure, but, if they be read with reference to the situation of the parties at the time the contract was made, and construed as a whole, their meaning is reasonably clear. The defendant was a stockholder and the superintendent of the plaintiff at the time the contract was made, and was the owner of the patent. He was anxious to have his corporation embark in the business of manufacturing and selling "Warm Ankles" under his patent, and to pay him a royalty therefor. He was the only practical hosiery man connected with the plaintiff's manufacturing plant, and seems to have been confident of the success of the proposed new enterprise, which would result in large profits to him from royalties; but some of the other directors of the plaintiff were doubtful as to its success. Under these circumstances business prudence and duty would suggest that

the defendant should indemnify his corporation against loss if it undertook the experiment of manufacturing and advertising and selling "Warm Ankles" under his patent.

If we keep in mind the situation of the parties and the relation of the defendant to the plaintiff, and read and construe the contract as a whole, we have but little difficulty in ascertaining the intention of the parties thereto. The provision of the contract to the effect that bad debts, countermands of orders for goods, and goods returned, upon which royalties have been paid, shall be charged back in proportion to the loss, construed without reference to the provision which follows it, would seem to justify the claim of defendant that his liability could not, in any event, exceed the amount of royalties received by him. But when this provision is read and construed with the other provisions of the contract it is clear that it relates exclusively to an adjustment of the royalties to be paid to the defendant in case the enterprise proves to be a success. The provisions of the contract which follow this one deal with the contingency that the enterprise may not prove profitable, and fix the liability of the defendant in that event. The contract, as we construe it, provides, with reference to this matter, that, if the enterprise proves unprofitable, the plaintiff may discontinue the manufacture of the article covered by the defendant's patent; that, if there is a loss in disposing of any of the articles manufactured prior to January 1, 1901, or if it is necessary to sell any of them thereafter manufactured at a loss, the defendant shall assume such loss; and, further, that unsalable stock shall be charged to him at cost of material and of manufacture, subject to his option to take such stock at such cost or let it be sold at a loss.

Such was, in effect, the construction of the contract by the trial court. The court found, with others, substantially the following facts: The plaintiff proceeded to manufacture, sell, and offer to sell the hosiery pursuant to the contract during the years of 1901 and 1902, but because of the necessary cost and expense of the manufacture and sale thereof, and because the same were not marketable or salable, the plaintiff sustained a loss from the sale thereof; that such loss resulted from the fact that the cost of manufacture and sale of the hosiery was greater than the price for which the same were and could be sold, and such

loss, including uncollectible debts and the reasonable cost of advertising such hosiery to induce purchases thereof, was the sum of $779.64. The enterprise was unprofitable, and for that reason the plaintiff January 1, 1903, discontinued the manufacture of the hosiery. On May 1, 1903, it had on hand hosiery so manufactured, which it was unable to sell, of the actual cost of $2,336.70 for labor and material entering into its manufacture. The defendant declined to exercise his option to take such hosiery at cost, and the plaintiff was obliged to and did sell it for $800, the best price obtainable therefor, whereby it sustained a further loss of $1,536.70. As a conclusion of law the trial court directed judgment for the plaintiff for the damages it had sustained. It is here urged by counsel for the defendant that the findings of fact and decision of the court are not justified by the terms of the contract or by the evidence. They are in accordance with the contract, as we construe it, and upon an examination of the competent evidence received on the trial we find that it is ample to sustain the findings of fact.

2. The trial court received in evidence, over the objection and exception of the defendant, some fifteen letters received by the plaintiff from its customers. This ruling of the court is assigned as error. The letters were prepared and sent out by the plaintiff after the commencement of the action, and consisted of questions as to the salableness of the hosiery, with blank places in which the customers wrote their answers. It is obvious that these letters were no part of the history or record of the plaintiff's business, and that they were obtained for the purpose of the trial, and to obviate the necessity of taking the depositions of the writers. The admission of the letters in evidence was error, for as to the defendant they were mere hearsay. But was it reversible error?

If the trial of the issues of fact had been by a jury, the admission of the incompetent evidence would have been reversible error, for the evidence related to a material issue, and, the court having admitted the evidence, the jury would have been bound to consider it. But this reason does not apply to cases where the issues of fact are tried by the court without a jury. Hence the rule is, where issues of fact are tried by the court without a jury, and incompetent evidence is admitted,

but the competent evidence is sufficient to support the findings of fact, and there is no reasonable ground for inferring from the character of the incompetent evidence that it was or might have been a material factor in the court's determination of the facts, the admission of such evidence is not reversible error. 2 Enc. Pl. § Pr. 567; Hogan v. Vinje, 88 Minn. 499, 93 N. W. 523.

In the case of Lowry v. Harris, 12 Minn. 166 (255), the volume and character of the evidence improperly received was such as to afford reasonable grounds for inferring that it might have influenced the determination of the facts. The decision in the case of Farmers Union Ele. Co. v. Syndicate Ins. Co., 40 Minn. 155, 41 N. W. 548, seems to have been based upon the exceptional character of the incompetent evidence received; but, however this may be, we are satisfied that the doctrine of that case should not be extended.

In the case here under consideration there was sufficient competent evidence to support the finding of the trial court that the hosiery in question was unsalable within the meaning of the contract—that is, that it could not be sold at a profit; and, further, the character of the incompetent evidence does not fairly justify the inference that such evidence might have been a material factor in the determination of the facts in this case. Its admission, therefore, was not reversible error. We find no error in the record which will justify a reversal of the order appealed from.

Order affirmed.