HUBERT J. FLEETHAM v. ROBERT W. LINDGREN, *d. b. a.* LaSALLE ENGINEERING COMPANY.[1]

April 26, 1946.

No. 34,193.

[1]Reported in 22 N. W. (2d) 637.

*Mark McCabe* and *Thomas McMeekin,* for appellant.
*Frank J. Collins* and *John Ott,* for respondent.

THOMAS GALLAGHER, JUSTICE.

Action to recover $6,356.55, the balance claimed to be due plaintiff for commissions on business procured by him for defendant between June 20, 1943, and May 1, 1944. The court found for plaintiff for the full amount claimed, and defendant appeals from an order denying his motion for a new trial.

Defendant contends (1) that the evidence is insufficient to sustain a finding that plaintiff and defendant entered into a verbal agreement under which defendant was to pay plaintiff as compensation a sum equal to ten percent of the gross business he procured for defendant; and (2) that the evidence is insufficient to sustain a finding that plaintiff procured orders for defendant totaling $139,065.55 during the period of his employment.

Viewing the evidence in the light most favorable to plaintiff, as required, the following facts appear: For some time prior to June 1943, defendant operated a machine shop known as the LaSalle Engineering Company, in the city of Minneapolis. In the first six months of 1943 his total gross sales equaled $20,971.84. At this time, his supervisory duties in the shop, as well as his physical condition, prevented his seeking new contracts or otherwise enlarging or expanding his operations.

At one time plaintiff had managed a machine shop, and shortly prior to June 1, 1943, had been employed by Northern Pump Company, a Minneapolis concern holding substantial war contracts with the United States government. In such employment plaintiff had become familiar with the personnel of said Northern Pump Company, as well as with its method of subletting portions of its work to small shops in Minneapolis and the vicinity.

At the suggestion of Kenneth F. Peterson, a mutual friend, plaintiff and defendant first discussed an employment contract on June 15, 1943. No definite agreement was then reached. Shortly thereafter, plaintiff inspected defendant's shop to ascertain the type and volume of work which might be performed there. Subsequently, on June 19, 1943, the parties had a further discussion of the employment contract. At that time plaintiff advised defendant that he had inspected the latter's shop and was confident that he could "fill his shop" with business. He proposed to work for a consideration of 15 percent of the gross business performed in the shop during his employment with defendant. Defendant advised him that the business would not stand such a high percentage and requested time to think over the proposition.

Defendant then made inquiry of army officials as to whether commissions might be paid on defense contracts involving work for the United States war or navy departments such as was then contemplated. He was advised that there was no restriction in such respect, although army officials "frowned" on the practice. Plaintiff testified that at the meeting on June 19 an agreement was reached between him and defendant whereunder plaintiff was to

receive ten percent of the gross sales of the shop. This was denied by defendant, who testified that the agreement reached provided for plaintiff's employment on a straight-salary basis only at the rate of $125 per week. Plaintiff does not dispute the fact that during his employment he received from defendant checks in the sum of $125 each week, but testified that such payments were merely in the nature of advances against his commissions.

Plaintiff thereafter commenced work for defendant on June 20, 1943, and continued in such employment until May 1, 1944. During such time defendant received contracts for work as follows:

| | |
|---|---|
| Northern Pump Company | $103,779.96 |
| Gray Company, Inc. | 32,651.59 |
| Industrial Tool & Die Co. Inc. | 2,634.00 |
| | $139,065.55 |

Defendant does not deny that the contracts with Gray Company and Industrial Tool & Die Company were procured for him by plaintiff. He asserts, however, that prior to June 26, 1943, he had received orders from Northern Pump Company, and that all subsequent work from this source was obtained either as a result thereof or because of his personal contact with expediters employed by that company.

Plaintiff's testimony submitted in support of his claim that he was the procuring cause of the foregoing contracts was to the effect that after his employment commenced he called upon Mr. R. H. Schumann, production manager of Northern Pump Company, who advised him that "We have given them [LaSalle Engineering Company] three or four purchase orders for materials, but we have had lots of trouble"; that Mr. Schumann further told him that if he (plaintiff) "was going in there and could see that the work was turned out in good shape, that he would give us all the business that we could handle"; and further added: "We are going to shut down next week for inventory and so that you will have enough to carry you over until after inventory I will shoot through these orders for flanges immediately."

Immediately thereafter a substantial order to cut steel for flanges came in, and subsequently defendant received orders from Mr. Schumann as rapidly as he could handle them. In consequence, defendant was obliged to increase his staff of employes from an average of 15 to an average of 35 to 50. As the work progressed, expediters employed by Northern Pump Company came in to inspect the work and to determine what additional volume of work could be handled. They would report back to Mr. Schumann and receive from him new orders for defendant for additional work. It is defendant's contention that orders thus brought in from the expediters should not be credited to the account of plaintiff. It was conceded, however, that the expediters had no authority to sign orders, and that all orders brought in by them were signed by Mr. Schumann as production manager of Northern Pump Company. Plaintiff offered further testimony that throughout his employment he kept in close contact with Mr. Schumann, either by telephone or by personal calls at his home, and that orders continued to come in regularly in accordance with the original promise made by Mr. Schumann.

The court found that plaintiff had been responsible for procuring the above contracts for defendant totaling $139,065.55, after making due allowance for the business obtained by defendant prior to plaintiff's employment.

It is undisputed that during plaintiff's employment defendant paid him the total sum of $7,550. Most of such amount was paid in weekly installments of $125 each. Had plaintiff been on a straight-salary basis of $125 per week, he would have been overpaid by defendant in the sum of $1,050. At times he received checks from defendant in substantial amounts. One such check, made on December 23, 1943, amounted to $1,000, while another, made in February 1944, amounted to $625. Several of the weekly pay checks were marked by defendant with the words "sales comm." On the basis of ten percent commission, the court found that the full amount earned by plaintiff on the foregoing contracts equaled

$13,906.55, which, after crediting the $7,550 previously paid, left a balance of $6,356.55 due plaintiff.

In a memorandum attached to the findings the trial court stated:

"Both plaintiff and defendant are intelligent, capable business men. Both made good witnesses, and each testified rather persuasively. The testimony, however, is in such radical conflict on most every important point that the conclusion is inescapable that one or the other has falsified.

"The following items of testimony are helpful in determining which claim is the more probable:

\* \* \* \* \*

"If defendant's claim is true as to the terms of the contract then the total amount payable at $125 per week would be $6,500 for one year. Plaintiff worked a little less than one year and received $7,550, $1,050 in excess of the amount that he would be entitled to under the contract as claimed by the defendant. The defendant's explanation of this over-payment is not very satisfactory.

"On several of the check stubs of the checks given to plaintiff from time to time appear the written words 'sales comm.' Writing these words upon the stubs is a verification of plaintiff's claim that he received a commission instead of a salary.

"It would seem to me probable that the defendant would make a commission contract rather than a fixed salary. Plaintiff was a comparative stranger to the defendant. The latter knew little of plaintiff's capacity to bring in business. Would it be probable that he would bind himself for a fixed salary without knowing whether or not plaintiff could produce any business? On the other hand, putting his services on a commission basis, plaintiff's compensation would depend entirely upon his capacity to bring in business.

"That the plaintiff was the procuring cause of the Northern Pump orders is probable because of the fact that before the contract was made the defendant had very little business from that company, and immediately after July 1st, 1943, the business increased very markedly. The defendant admits that the plaintiff was the procuring cause of the Gray Company and the Industrial Tool and

Die Company business, the only other two parties furnishing business to the defendant.

        \*     \*     \*     \*     \*

"The court concludes that the burden of proof on plaintiff has been sustained, and that the claim of plaintiff as to the contract is more probable than that of defendant."

Plaintiff repeatedly demanded payment of the additional sums due him and for an accounting to determine the same. Defendant, for one reason or another, according to plaintiff's testimony, refused to account.

Plaintiff terminated his employment with defendant on May 1, 1944, and commenced this action for his commissions on July 17, 1944.

▪ The sole question for determination is whether there is sufficient evidence to sustain the trial court's findings. We have stated many times that if there is any evidence which reasonably sustains such findings they will not be disturbed here. 1 Dunnell, Dig. & Supp. § 411, and cases cited.

It appears that there is ample evidence to sustain the finding that an agreement was made between the parties under which plaintiff was to be paid on a ten-percent-commission basis rather than by weekly salary. Plaintiff's testimony with respect thereto was definite and unshaken under cross-examination. Defendant's was equally definite that the agreement was consummated on a salary basis only. The case then resolved itself into a question of the credibility of the two witnesses. Had there been no further corroborative evidence, the trial court might correctly have determined the contract issue on the basis of its belief in plaintiff's testimony and its doubt as to defendant's. Under the authorities cited, we would be obligated to hold plaintiff's testimony, standing alone, as sufficient reasonably to sustain the trial court's finding on this issue. Exrieder v. O'Keefe, 143 Minn. 278, 173 N. W. 434.

In addition, however, there is much evidence which corroborates plaintiff's testimony. Thus, the fact that defendant labeled many of the pay checks as "sales comm." and the fact that he paid plain-

tiff $1,050 in excess of the amount due had plaintiff been on a $125-per-week salary basis lend support to the trial court's determination. Further, as the court's memorandum indicated, it is unlikely that defendant would bind himself on a straight-salary basis without knowing plaintiff's capacity for the production of business, or other like factors commonly considered before a salary agreement is consummated. Since, as previously indicated, determination of this issue is a fact matter and since there is evidence which reasonably sustains the trial court's finding thereon, we have no choice but to affirm the same.

■ The record is fairly clear that the only business performed by defendant after plaintiff's employment commenced was for the three firms with which plaintiff had direct connections. That the business received from two of these concerns came as a result of plaintiff's efforts is undisputed. As to the other, Northern Pump Company, plaintiff had just terminated his employment therewith. It is reasonable to assume that his friends and associates there might be willing to help him in his new venture. It is undisputed that he made several calls on the production manager thereof and that he talked with him on the telephone, all with reference to obtaining business for defendant; that he was assured by the production manager that orders would follow immediately; and that, after such calls and visits, orders from Northern Pump Company came in substantial quantities throughout plaintiff's employment with defendant.

Prior to plaintiff's employment the total orders from this source amounted to only $3,521.83; and, some dissatisfaction having arisen in connection therewith, it was indicated that Northern Pump Company was not interested in forwarding further business to defendant, and did not do so until plaintiff had made his original contact with the production manager thereof. Thereafter, orders jumped to $103,779.96, and there is nothing to indicate that defendant did anything to bring this about or to increase the business as indicated. The fact that expediters employed by Northern Pump Company actually delivered the orders to defendant after they had

been signed by Mr. Schumann, the production manager, would not alter the fact that Mr. Schumann was the source or origin of said orders and that they came after plaintiff's original and subsequent calls upon him. Defendant specifically conceded that the expediters had no authority to sign or make orders on behalf of Northern Pump Company. In the light of this evidence, we hold that the finding of the trial court that plaintiff was the procuring cause of such orders from Northern Pump Company is amply sustained.

■ Defendant asserts that the evidence does not sustain the court's finding as to the amount of sales on which plaintiff claims commission insofar as Northern Pump Company is concerned. To establish this amount, plaintiff submitted a memorandum furnished by Northern Pump Company and offered testimony based thereon that that company had given orders to defendant while plaintiff was in his employ amounting to $107,182.84. The court refused to admit this testimony or the memorandum, holding the latter not the best evidence. However, the court permitted plaintiff to testify, upon his own recollection, that the total business given to defendant by Northern Pump Company during plaintiff's employment amounted to approximately $107,000. It is defendant's contention that the admission of this evidence was improper and constituted reversible error.

If such testimony was improperly received, it must be noted that it was subsequently supported by the books and records of defendant submitted and received in evidence and explained by defendant's auditor, Charles A. Lynch. Therefrom it was ascertained that the total business with Northern Pump Company from June 20, 1943, to May 1, 1944, equaled $107,301.79. Defendant could identify only $3,521.83 as procured from that concern prior to plaintiff's employment. The court subtracted this amount from the total amount ascribed to plaintiff's efforts. There can be no dispute that the books and records submitted constituted good evidence as to the figures set forth therein with reference to the issue involved. H. F. Shepherdson Co. v. Central F. Ins. Co. 220 Minn. 401, 19 N. W. (2d) 772. Under such circumstances, if error occurred in the ad-

mission of plaintiff's testimony as to his recollection of the approximate amount of business procured from Northern Pump Company, such error would appear to be harmless and fully corrected by the subsequent admission of the books of account and the figures disclosed therein, as well as by the admission of defendant with reference thereto. The applicable rule is well expressed in Mankato Mills Co. v. Willard, 94 Minn. 160, 164, 102 N. W. 202, 203:

"* * * where issues of fact are tried by the court without a jury, and incompetent evidence is admitted, but the competent evidence is sufficient to support the findings of fact; and there is no reasonable ground for inferring from the character of the incompetent evidence that it was or might have been a material factor in the court's determination of the facts, the admission of such evidence is not reversible error."

It is to be noted further that if any serious dispute existed as to the figures submitted with reference to the amount of defendant's business with Northern Pump Company, defendant, with full access to his books of account and records, might readily have submitted additional evidence to indicate any such discrepancies or differences on this issue. He did not choose to do this. On the contrary, his answers to specific questions as to the amount of business received from Northern Pump Company appeared evasive and unsatisfactory. In any event, defendant's books, properly received in evidence and explained by defendant's auditor, were ample to sustain the court's finding as to the gross sales upon which plaintiff was entitled to commission and to render harmless any error in receiving plaintiff's oral testimony with reference thereto.

Having determined that the evidence properly received by the trial court reasonably sustains the findings herein, we are compelled to affirm them.

Affirmed.